(13 App. Div. 72.)

### BRONK v. BARCKLEY et al.

(Supreme Court, Appellate Division, Third Department.   January 26, 1897.)

1. CONSTITUTIONAL LAW—OBLIGATION OF CONTRACTS—PIECE PRICE SYSTEM.
    Const. art. 3, § 29, providing that after January 1, 1897, no person under sentence in any state prison shall be allowed to do work whereby its product or profit shall be farmed out, contracted, or sold, does not invalidate a contract made before the adoption of the constitution, under Laws 1889, c. 382, authorizing the managing authorities of any state prison to contract for convict labor on the "piece price system."

2. SAME—POLICE POWER—PRISONS.
    Const. art. 3, § 29, regulating the manner of employing state prisoners confined in its penal institutions, is not the exercise of the "police power" of the state; and hence it cannot have a retrospective operation, so as to nullify a valid contract made by the state prior to the adoption of the constitution. Parker, P. J., and Merwin, J., dissenting.

3. SAME—LICENSE—REVOCATION.
    The provision of Laws 1889, c. 382, § 3, that the managing authorities of state prisons may contract for the labor of the prisoners under the "piece price.

system," is a license from the state to carry on a business; and hence a contract made under it is based entirely on the continuation of the license, and the revocation of the license does not therefore unlawfully impair the obligation of the contract. Per Parker, P. J., and Merwin, J., dissenting.

Submission without action of a controversy between Edgar Bronk, as plaintiff, and Edward L. Barckley, James M. Borthwick, and Eugene Burlingame, constituting the board of commissioners of the Albany Penitentiary commission, and Chester F. Dearstyne, as superintendent of the Albany Penitenitary, as defendants, on an agreed statement of facts. Judgment for plaintiff.

Argued before PARKER, P. J., and LANDON, HERRICK, MERWIN, and PUTNAM, JJ.

Countryman, Du Bois & Bevans (P. E. Du Bois, of counsel), for plaintiff.

Burlingame & Le Boeuf (Randall Le Boeuf, of counsel), for defendants.

PUTNAM, J. The contract which the plaintiff seeks to enforce was executed under and in pursuance of the provisions of chapter 382, Laws 1889, which provided that:

"The managers of the New York State Reformatory at Elmira and the managing authorities of any of the penitentiaries or other penal institutions of this state are hereby authorized to conduct the labor of the prisoners therein respectively under the public account system, or piece price system, in like manner and subject to like restrictions as labor is authorized by title two of chapter three of part four of the Revised Statutes, as hereby amended, to be conducted in the state prisons." "By the piece price system is meant the system by which the state receives payment for the products of the labor of the prisoners upon materials and machinery furnished by the person making such payment or furnished partly by such person and partly by the state."

This statute must be deemed to have authorized a "time contract." Under its provisions, the managers of the Albany Penitentiary could lawfully enter into an agreement with the plaintiff to furnish convict labor to be employed upon materials and with machinery to be furnished by him. Under such an agreement, the contractor must place his machinery in the prison, and obtain his materials, and thereafter the contract is to be carried out. A "piece price" contract, authorized by the statute, is necessarily one to be performed after the making of it,—a "time contract." Nor is it claimed by the defendants that the agreement in question was an unfair or unreasonable one. In fact, the submission concedes that it was valid and binding at the time of the adoption of the present state constitution. I have no doubt that the commissioners of the Albany Penitentary commission were authorized to enter into it under the statute above quoted. The contract was fairly within the power conferred.

There was, therefore, at the time of the enactment of section 29, art. 3, of the constitution of the state, a legal contract between the plaintiff and the managers of the Albany Penitentiary. It was authorized by a general statute of the state, and was as valid and binding as if the legislature had, by a special statute, authorized the

43 N.Y.S.—26

commissioners to enter into the agreement in question. It is not clear that section 29, art. 3, supra, was intended to have a retrospective effect, or to invalidate contracts lawfully made in pursuance of the authority of the state prior to the adoption of the constitution. It is true that the words of the section are sufficient to cover past as well as future agreements; but it has been held that general words in a statute should not be so construed as to nullify contracts made before the law was passed. Dash v. Van Kleeck, 7 Johns. 477; Sackett v. Andross, 5 Hill, 327–334; Wood v. Oakley, 11 Paige, 400; Johnson v. Burrell, 2 Hill, 238; Warren Manuf'g Co. v. Etna Ins. Co., 2 Paine, 501, Fed. Cas. No. 17,206. Without passing upon this question, however, and assuming that the section of the constitution referred to was intended to have a retrospective operation, and hence to nullify the agreement sought to be enforced, and that its effect, if valid, was to terminate and destroy the rights of the plaintiff under his contract, it is difficult to see why the section in question does not violate the provisions of article 1, subd. 10, of the constitution of the United States, prohibiting a state from passing a law impairing the obligation of a contract. The plaintiff claims under a written agreement authorized by statute, and conceded to be valid when the state constitution was adopted. If that constitution was intended to invalidate his contract, why does it not violate the provisions of the national constitution?

In Hall v. Wisconsin, 103 U. S. 5, the facts were as follows: The governor of Wisconsin, in pursuance of a statute of the state authorizing him to do so, had entered into a contract with one Hall for the performance of services for an agreed time and price. Before performance, the statute authorizing the contract was repealed. It was held that:

"A contract between a state and a party, whereby he is to perform certain duties for a specific period at a stipulated compensation, is within the protection of the constitution; and, on his executing it, he is entitled to that compensation, although, before the expiration of the period, the state repealed the statute, pursuant to which the contract was made."

I think the doctrine enunciated in the authority cited, and many other cases to the same effect to which I do not deem it necessary to refer, apply to this case.

It is suggested that the act of 1889 conferred upon the commissioners of the Albany Penitentiary a mere license, revocable at the will of the legislature, and that the parties should be deemed to have dealt with the subject-matter, knowing that it was under the control of the state, and liable to be affected by changes in the rules and regulations. The act of 1889 was a law of the state which empowered the making of the very contract under which the plaintiff claims. It conferred authority upon the commissioners to contract, and, they having legally acted under that authority, the state should not be allowed by a retrospective statute to destroy the validity of a contract thus lawfully made. As above suggested, the statute is the same as if the legislature had by a special act authorized the defendants to make the agreement in question. It would be more correct to say that the act of 1889 conferred on the managers of the Al-

bany Penitentiary authority to contract, rather than a license to do so.

But it is suggested that section 29 of article 3 of the state constitution, supra, and the act of the legislature passed in pursuance of its provisions, do not violate the provisions of the national constitution, because they were enacted under and in pursuance of the police power reserved to the states. It may be conceded that chapter 382, Laws 1889, which provides for the government, management, and maintenance of prisons, the disposition, instruction, and labor of prisoners, was an act passed by the state in pursuance, according to the largest definition, of its police powers. The same may be said of the state constitution above referred to, and the act of the legislature in pursuance thereof.

It has been held in certain cases that the legislature cannot bargain away the police power of the state; that one legislature cannot pass a statute that will prevent the future action of its successors in police matters. In Stone v. Mississippi, 101 U. S. 814, the facts were as follows: The legislature of Mississippi in 1867 granted a charter to a lottery company for 25 years. In 1868 a new constitution was adopted by the state, the effect of which was to repeal such charter. It was held that the provisions of the new constitution were not in conflict with section 10, art. 1, of the national constitution. In the opinion it was said:

"The legislature cannot bargain away the police power of a state. Irrevocable grants of property and franchises may be made if they do not impair the supreme authority to make laws for the right government of the state; but no legislature can curtail the power of its successors to make such laws as they deem proper in matters of police."

The same doctrine was stated in Boyd v. Alabama, 94 U. S. 645–650; Board v. Barrie, 34 N. Y. 657–667, 668; State v. Holmes, 38 N. H. 225; Powell v. Pennsylvania, 127 U. S. 678, 683, 8 Sup. Ct. 992, 1257; Beer Co. v. Massachusetts, 97 U. S. 25; Fertilizing Co. v. Hyde Park, Id. 659–663; People v. Squire, 107 N. Y. 593, 14 N. E. 820.

In Stone v. Mississippi, supra, the object of the new law was to suppress lotteries, called, in the opinion, "a species of gambling, and wrong in their influences." In Boyd v. Alabama, supra, the repealing statute referred to was also enacted to suppress a lottery; and it was stated in the opinion that one legislature could not restrain the power of a subsequent one "to suppress any and all practices tending to corrupt the public morals." In Board v. Barrie and State v. Holmes, supra, the repealing statutes referred to terminated licenses to sell liquors theretofore granted, and directly affected the public health and morals. Powell v. Pennsylvania, supra, referred to a statute of Pennsylvania "for the protection of the public health, and to prevent adulteration of dairy production, and fraud in the sale thereof." Beer Co. v. Massachusetts, supra, considered an act of the legislature to regulate the sale of intoxicating liquors. Fertilizing Co. v. Hyde Park and People v. Squire, supra, were cases upholding the power of a legislature to prevent a corporation from so conducting its business as to create a pub-

lic nuisance. In People v. Girard, 145 N. Y. 105, 39 N. E. 823, the power of the legislature to prohibit the adulteration of vinegar was sustained. And in People v. Warden of City Prison, 144 N. Y. 529, 39 N. E. 686, chapter 602, Laws 1892, providing for the examination and registration of "employing or master plumbers," was held con-stitutional, as an act affecting the public comfort and health.

It will be seen that the above and other cases which might be cited, holding that one legislature cannot, by contract, prevent a subsequent one from exercising the police powers reserved to the states, refer to police powers exercised in matters relating to the public health, morals, comfort, or safety. They do not hold that a state, by a retrospective law, can impair the validity of a con-tract made or authorized by it, and which it had power to make or authorize; but they determine that a legislature has no power to prevent its successors from exercising the police power re-served to the states in matters directly affecting the public health, morals, comfort, or safety. If it attempts to do so, the act is be-yond its power; and hence a retrospective law affecting the valid-ity of such contract does not violate the provisions of the na-tional constitution. In that case the contract impaired by the subsequent law is not a legal or authorized one, and has been termed in some of the cases a license rather than a contract, valid while it exists, but revocable at the will of the legislature. In matters, however, not directly affecting the public health, morals, comfort, or safety, I think it must be deemed an established doc-trine that a state may make or authorize a valid contract which cannot be impaired by a subsequent constitutional amendment or statute. A retrospective law which impairs a contract, to be valid, must be an exercise of the police power, within a narrow def-inition of that phrase. In some authorities, the phrase "police power" is defined to be legislation in regard to any matter affected by the public interest; while, in the cases above referred to, the words are given a more restricted meaning, and apply to laws di-rectly affecting the public health, morals, comfort, or safety. While there is some apparent conflict in the authorities on this subject, I think it must be held that while the legislature, by a statute, cannot make or authorize a contract that will prevent the exercise of the police powers by its successors in matters intimately con-nected with the public morals, comfort, health, or safety, in all other regards it can; that the cases where a retrospective law can nullify a contract authorized by the statute are rather an excep-tional class, and an exercise of the police power within the narrow definition of that phrase. Ordinarily, the police powers of a state are subject to the provisions of the national constitution.

In Re Jacobs, 98 N. Y. 98–108, Judge Earl, speaking of the police power of a state, remarks:

"But the power, however broad and extensive, is not above the constitution. When it [the constitution] speaks, its voice must be heeded. It furnishes the su-preme law, the guide for the conduct of legislators, judges, and private persons, and, so far as it imposes restraints, the police power must be exercised in sub-ordination thereto."

The same doctrine was stated in People v. Gillson, 109 N. Y. 401, 17 N. E. 343, in the opinion of Peckham, J.    See, also, Town of Lake View v. Rose Hill Cemetery Co., 70 Ill. 191, 192; Brennan v. City of Titusville, 153 U. S. 289–299, 14 Sup. Ct. 829; Walling v. Michigan, 116 U. S. 446–460, 6 Sup. Ct. 454.

The distinction between the case where a legislature may or may not, by a retrospective statute, invalidate a contract previously authorized by the state, is referred to in Butchers' Union Slaughterhouse Co. v. Crescent City Live-Stock Landing Co., 111 U. S. 746–751, 4 Sup. Ct. 652, 654, where it is said:

"While we are not prepared to say that the legislature can make valid contracts on no subject embraced in the largest definition of the police power, we think that, in regard to two subjects so embraced, it cannot, by contract, limit the exercise of those powers to the prejudice of the general welfare. They are the public health and the public morals. The preservation of these is so necessary to the best interests of social organization that a wise policy forbids the legislative body to divest itself of the power to enact laws for the preservation of health and the repression of crime."

In New Orleans Gaslight Co. v. Louisiana Light & Heat Producing & Manuf'g Co., 115 U. S. 650, 6 Sup. Ct. 252, a legislative grant of an exclusive right to supply gas to a municipality and its inhabitants, through pipes and mains laid in the public streets, was upheld as a contract protected by the constitution of the United States against state legislation to impair it, and that, in granting the exclusive franchise to supply gas to a municipality and its inhabitants, the state legislature did not part with the police power and duty of protecting the public health, the public morals, and the public safety.    In Waterworks Co. v. Rivers, 115 U. S. 674, 6 Sup. Ct. 273, the same doctrine was held in reference to a grant of an exclusive right to supply water to a municipality. The granting of the charters by the state to the gas company and to the water company referred to in the cases last cited, and the enacting of the statutes attempting to repeal the charters so granted, was an exercise, according to its largest definition, of the police power of the state in a matter affecting the public welfare.    The state, in the first instance, in the exercise of its police power, had deemed it wise to grant exclusive privilege to the corporations referred to.    Afterwards it abandoned that policy.    But it was held that such change of policy does not affect contracts which, when entered into, were lawfully made, and within the power of the state to make.

In the opinion of Harlan, J., in New Orleans Gaslight Co. v. Louisiana Light & Heat Producing & Manuf'g Co., 115 U. S. 669, 6 Sup. Ct. 262, he referred to some of the cases holding that one legislature cannot, by contract, limit the discretion of its successor in police matters, as follows:

"The principle upon which the decisions in Beer Co. v. Massachusetts, Fertilizing Co. v. Hyde Park, Stone v. Mississippi, and Butchers' Union Slaughterhouse Co. v. Crescent City Live Stock Landing Co. rest is that one legislature cannot so limit the discretion of its successors that they may not enact such laws as are necessary to protect the public health or the public morals. That principle, it may be observed, was announced with reference to particular kinds of private

business, which, in whatever manner conducted, were detrimental to the public health or the public morals. It is fairly the result of these cases that statutory authority given by the state to corporations or individuals to engage in a particular private business attended by such results, while it protects them for the time against public prosecution, does not constitute a contract preventing the withdrawal of such authority, or the granting of it to others."

I think it was within the power of the legislature to authorize the contract made by the commissioners of the Albany Penitentiary with the plaintiff, which the latter now seeks to enforce. The state, by the act of 1889, adopted the policy of furnishing the labor of its convicts under the "piece price system." By the present constitution it has abandoned that system. The new constitution works a mere change of policy in the manner of employing convicts. To a certain extent the constitutional enactment in question affects the public interests. But the same could be said of almost every law. The statutes referred to in Re Jacobs and People v. Gillson, supra, and in People v. Marx, 99 N. Y. 377, 2 N. E. 29, clearly concerned the public interest; but it was held in those cases that such statutes did not affect the public health, and hence were not within the police power reserved to the state, and were unconstitutional. It cannot be said that the state constitution regulating the manner of employing state prisoners confined in its penal institutions affects the public health, morals, comfort, or safety. Hence it should not be given a retrospective operation, so as to nullify a contract authorized by the state, and adopted by it prior to the enactment of the new constitution.

Cases like the one under consideration, where a constitutional amendment is claimed to have a retrospective operation, and to invalidate an authorized contract entered into in pursuance of an authority conferred by the legislature, are clearly distinguishable from that class of cases like People v. Budd, 117 N. Y. 1, 22 N. E. 670, 682, Munn v. Illinois, 94 U. S. 113, and Buffalo E. S. R. Co. v. Buffalo St. R. Co., 111 N. Y. 132, 19 N. E. 63, where it has been held that a legislature could lawfully regulate the manner in which a company previously incorporated must conduct its business, and the prices it may charge, and that such legislation does not violate the provisions of the national constitution. A law making a reasonable regulation in regard to the manner of conducting a business of a corporation is very different from one absolutely nullifying a contract or charter lawfully made or granted. Yet it has been held in regard to statutes regulating the business of a corporation that legislation affecting the corporate powers "must not be in conflict with any of the provisions of the charter, and they must not, under any pretense of regulation, take from the corporation any of the essential rights and privileges which the charter confers. In short, they must be police regulations in fact, and not amendments of the charter in curtailment of the corporate franchises." Cooley, Const. Lim. (4th Ed.) 719; Sinking Fund Cases, 99 U. S. 700–721.

I conclude that the contract in question is valid, unaffected by the provisions of the present state constitution, and protected by

the provisions of the national constitution; and, the learned counsel for the defendant conceding that on such a determination a judgment for a specific performance should be entered in favor of the plaintiff, judgment should be directed accordingly.

HERRICK, J., concurs in result.

LANDON, J. (concurring). The new constitutional provision of the state is, no doubt, valid as to future contracts for labor, since no provision of the federal constitution is contravened by applying the state provision to future cases. "No state shall pass any * * * law impairing the obligation of contracts." Const. U. S. art. 1, § 10. This provision inhibits such laws ordained by a state constitution as well as enacted by the legislative body. Railroad Co. v. Rock, 4 Wall. 177, 181; Railroad Co. v. McClure, 10 Wall. 511, 515; Railroad Co. v. McGuire, 20 Wall. 36; White v. Hart, 13 Wall. 646; Marsh v. Burroughs, 1 Woods, 463, 472, Fed. Cas. No. 9,112; New Orleans Gaslight Co. v. Louisiana Light & Heat Producing & Manuf'g Co., 115 U. S. 650, 672, 6 Sup. Ct. 252; Osborn v. Nicholson, 13 Wall. 654; Fisk v. Police Jury, 116 U. S. 131, 6 Sup. Ct. 329. By the constitution of the United States, specified powers are granted to the Union, certain specified powers are prohibited to the states, and the powers not granted to the Union or prohibited by it to the states are reserved to the states. Const. U. S. Amend. 10. Hence it follows that the police powers reserved to the states are those which do not conflict with the powers granted to the Union, or are not prohibited in terms or by necessary implication to the state. Brennan v. City of Titusville, 153 U. S. 289, 14 Sup. Ct. 829, and cases cited at page 299, 153 U. S., and page 831, 14 Sup. Ct. Hence it also follows that a contract which the contracting parties had full power to make, when made, and as made, cannot be impaired in its obligation by any state law, whether purporting to be an exercise of its police powers or not; since the power to do so is by the constitutional provision of the United States first above quoted expressly prohibited to the states.

The questions to be considered are: (1) Is the instrument a contract? (2) Did the defendants have the power to make it, as they made it? And involved in the last question: (3) Do the reserved police powers of the state authorize it to terminate a contract for prison labor entered into before the state concluded to change its policy?

1. The terms of the instrument set forth as a contract are those of a contract, and all the requisites of a contract are present; and in this, as well as in other respects, this instrument is unlike a license to sell liquor; and hence Board v. Barrie, 34 N. Y. 657, People v. Board of Com'rs of City of Brooklyn, 59 N. Y. 92, and People v. Meyers, 95 N. Y. 223, do not apply. Nor is it like a revocation of a charter to authorize gambling by lottery, as in Stone v. Mississippi, 101 U. S. 814, since the state in that case had no right to bargain away its power even temporarily to suppress gambling. Clearly, the instrument is not a mere license, like the privilege to sell liquor,

to maintain a lottery, to keep a pawnbroker's shop, or run a public hack, to be an auctioneer, or peddler, or the like.   I have no doubt that it is a contract.   The statute under which it was made authorized the employment of prisoners under the "piece price system," and, to do that, a contract was needed.

Title 2 of chapter 3 of part 4 of the Revised Statutes, relating to state prisons, and for other purposes connected therewith, as amended by chapter 382 of the Laws of 1889, and which was! in force at the time of the execution of the contract in question (December 1, 1893), and under and pursuant to which law the commissioners of the Albany Penitentiary, acting for and under their authority and direction, executed said contract, provides as follows:

"The system of productive labor in each of said prisons shall be either the public account system, or what is known as the 'piece price system,' or partly one and partly the other of such systems, as the superintendent of state prisons shall determine.  By the public account system is meant the system by which the state furnishes machinery and material for the labor of the prisoners, and receives the market products of such labor thereon.  By the piece price system is meant the system by which the state receives payment for the products of the labor of the prisoners upon materials and machinery furnished by the person making such payment, or furnished partly by such persons and partly by the state."  Sess. Laws 1889, p. 526, c. 382, § 1 (old section, as changed, 102).

"Whenever the amount appropriated by the state therefor shall be insufficient to conduct or continue such productive labor under the public account system, it shall be the duty of the superintendent of said prisons to use his best endeavors to cause such productive labor to be conducted under the piece price system."  Sess. Laws 1889, p. 526, § 103.

The defendants had the like powers.   If there was any license, it was not created by the agreement;  it was not a license to the plaintiff.   There is more semblance of a license given to the defendants by the statutes which permitted them to make this contract.   But, whether license, mandate, or authority, whatever was validly done under it cannot be revoked by a subsequent repeal of the statute or revocation of the authority.   The defendants had labor to sell or dispose of, and they sought a customer, and found the plaintiff, and sold or disposed of it to him.   They have no authority to make any new like contracts, but this one remains.

2. Did the defendants have the power to make the contract as they made it,—that is, for a term of years, with the privilege to the plaintiff of a further term at his election?   It is not claimed that the provisions of the contract are contrary to the usual or reasonable course of business.   The defendants kept within their powers as the statutes conferred them.   The only ground upon which it is alleged that they exceeded their powers is that they did not have all the powers the statute expressed, since the state had no right to confer upon them the power to make such a contract except subject to the power of the state to revoke or terminate it at its pleasure.

3. Is this so?   The question between the plaintiff and defendants should not be confounded with the question between the prisoners and the state.   One respects the validity and obligation of a contract;  the other is mere matter of punitory regulation.   The defendants could make a contract with the plaintiff respecting the labor of the prisoners, but could make none with the prisoners.

The police power, which the state cannot bargain away, respects the health, morals, good order, and safety of persons and property within the state. By what different regulations it permits them to be safeguarded the courts do not attempt to say, except as the cases arise. They are careful to detect violations of constitutional safeguards masquerading in the garb of police powers. In Stone v. Mississippi, supra, the court sustained the repeal of a charter authorizing a lottery company to do its business for 25 years upon payment to the state of certain sums of money. The court said that, if there had been a contract in the charter which the state had the right to make, it could not impair it, but the alleged contract was for a gambling privilege, and the state had not the right to bargain away the police power of the state to suppress gambling. It cannot bargain away its power to regulate or prohibit the sale of intoxicating liquor, or its power to procure a supply of pure and wholesome water, or to suppress or regulate occupations or practices tending to impair the public health, or corrupt the public morals, or engender pauperism and crime. Why not? Because it is its duty to retain unimpaired the full freedom of their proper exercise. It is obvious that the purpose of the state was to prevent the competition of convict labor with free labor,—a purpose which, when its effects upon the prisoners are more fully shown by the results, good morals may possibly condemn. The police powers of the state are reserved to it to promote its best welfare. They have hitherto involved matters of high concern to that welfare. To respect this contract, and perform its obligations in good faith, contravenes no public duty, but, on the contrary, harmonizes with a just sense of good faith and good morals. It would be unfortunate if the shield of good morals should be converted into the sword to cut them down. This contract respects labor,—not liquor, not lottery tickets, not any franchise or governmental privilege or exemption.

As said in Powell v. Pennsylvania, 127 U. S. 686, 8 Sup. Ct. 992, 1257:

"If the incompatibility of the constitution and the statute is clear and palpable, the courts must give effect to the former. And such would be the duty of the court if the state legislature, under the pretense of guarding the public health, the public morals, or the public safety, should invade the rights of life, liberty, or property, or other rights secured by the supreme law of the land."

The subject-matter of this contract is the labor of prisoners undergoing sentence for crime. Involuntary servitude for the punishment of crime is permissible. Const. U. S. Amend. 13. Before the recent enactments, the state could itself provide for the employment of the prisoners, or let, or permit to be let, their services to contractors. Their employment is still enjoined upon the state; the contract system is prohibited. Thus, the manner, but not the matter, of penal servitude, is affected; a mere narrowing of the employers of such labor, but no denial of the necessity, humanity, or propriety of compelling or employing such labor. The contract system was under such superintendence of the public authorities as was necessary for its humane administration.

While it may be conceded that the state can, in the exercise of its

police powers, change its policy from mere motives of partisan, as distinguished from political, advantage, the authorities are ample to the effect that it must do so subject to existing contract rights. New Orleans Gaslight Co. v. Louisiana Light & Heat Producing & Manuf'g Co., 115 U. S. 650, 672, 6 Sup. Ct. 252; White v. Hart, 13 Wall. 646; Osborn v. Nicholson, Id. 654; Van Hoffman v. City of Quincy, 4 Wall. 552; Waterworks Co. v. Rivers, 115 U. S. 674, 6 Sup. Ct. 273; Louisville Gas Co. v. Citizens' Gaslight Co., 115 U. S. 683, 6 Sup. Ct. 265; St. Tammany Waterworks v. New Orleans Waterworks, 120 U. S. 64, 7 Sup. Ct. 405. Contracts made by legislative enactments to exempt certain property from taxation, founded upon sufficient consideration, if explicit in declaring such exemption, cannot be impaired by subsequent legislative or constitutional enactment. New Orleans v. Houston, 119 U. S. 265, 7 Sup. Ct. 198; Railroad v. Reid, 13 Wall. 264; Bank v. Knoop, 16 How. 369. If the consideration is sufficient, the equivalent of taxation is retained, and public interests are not sacrificed.

But it is said a state, like an individual, may refuse to perform its contract, and elect to respond in damages for its breach. Lord v. Thomas, 64 N. Y. 107. In the case before us the state is not a contracting party. The county of Albany is the real party in interest, represented by the defendants. The county has not elected to break its contract, except as it is held up and disabled by the state. It is willing to perform it; it is to its advantage to do so; and, if its obligations have not been superseded by state enactment, it is ready to perform as agreed, and in such case defendants ask us to decree performance. It would be unjust to the county to make it respond in damages for a breach of its contract under such circumstances. The Lord Case does not apply. Moreover, no law should be construed retrospectively in the absence of words declaring or plainly implying its retrospective operation. Auffm'ordt v. Rasin, 102 U. S. 620.

Judgment should be directed for the plaintiff for the specific performance of the contract.

PARKER, P. J. (dissenting). I cannot concur with the conclusion which a majority of my brethren have reached in this case, and, inasmuch as I deem it to be one of more than usual public interest, I shall briefly give the reasons for my dissent.

The contract which the plaintiff seeks to have specifically enforced is one made with the Albany Penitentiary, on December 1, 1893. Under it, the authorities of the penitentiary agree to furnish 125 of the convicts confined therein, to work for the plaintiff under the "piece price system," so called, for the term of three years from that date, for rates and terms expressed therein. The contract also contained a covenant to the effect that if the plaintiff should faithfully perform all the obligations therein contained on his part, and should give a written notice, three months prior to its expiration, of his desire and intention to renew and extend such contract for a further period of three years, then, in that case, the plaintiff should have the right to so renew and extend the

same; and the penitentiary, on its part, agrees that it would so renew and extend such contract for the further term of three years from the time when it would otherwise expire, and, to that end, would, on demand of the plaintiff, execute all further writings or agreements needful and sufficient thereto. The plaintiff elected to continue such contract, and in due season served the requisite notice. The authorities concede that he faithfully performed all the obligations on his part, and that, under the terms of the contract, he is entitled to have it extended for the period of three years from December 1, 1896; but they refuse to so extend or continue it, and to execute the written agreement to extend therein provided for on their part, and base their refusal on the fact that on January 1, 1895, an amendment to the constitution of this state took effect, being a portion of section 29 of article 3, which reads as follows:

"The legislature shall, by law, provide for the occupation and employment of prisoners sentenced to the several state prisons, penitentiaries, jails and reformatories in the state; and on and after the first day of January, in the year one thousand eight hundred and ninety-seven, no person in any such prison, penitentiary, jail or reformatory, shall be required or allowed to work, while under sentence thereto, at any trade, industry or occupation, wherein or whereby his work, or the product or profit of his work, shall be farmed out, contracted, given or sold to any person, firm, association or corporation,"

—And that, by chapter 429 of the Laws of 1896, the legislature of this state passed a law to a similar effect.

It is manifest that the contract in question cannot be extended and operated after January 1, 1897, except in opposition to the prohibition contained in the constitution and statute above cited; and the single question presented here is whether such prohibition is operative as against that contract to extend. The Albany Penitentiary is, in relation to its business management, a private institution. It was organized under a special statute, authorizing the board of supervisors of Albany county to provide a penitentiary for the confinement of certain criminals sentenced in the courts of that county. By subsequent legislation it was made lawful for such board of supervisors to contract with any of the other counties in the state for the confinement of certain of their criminals for a stipulated compensation; and by further legislation the management of the institution was changed from the board of supervisors to a commission, with like powers. The expenses of the institution are borne by the county of Albany, and the income from the same belongs to such county. The contract in question, therefore, is not a contract between an individual and the state, but one between individuals; and the plaintiff contends that the laws under which the defendants justify their refusal to continue such contract are a direct violation of section 10 of article 1 of the federal constitution, in that they impair the obligation of the contract between him and the penitentiary; and that, therefore, so far as this contract is concerned, they are inoperative and void. The business of farming out convict labor is not one common to all citizens. The state alone has the management and control of it.

In the exercise of its duty to preserve the safety and good order of society, the state provides courts for the conviction of those who offend against its laws, and prisons where they are confined and punished. As the number of such prisons and the multitude of such prisoners have increased, it has become a serious problem how to best care for their proper treatment, and for the interests of the state at large. Theories concerning their employment have varied, and are likely to vary, under the light of future experience. Evidently, the state can be bound by no fixed rule, but must change its methods as its duty to the prisoners themselves and to the public seem to require. This management of prisons and of prison labor is one of the departments of state government, and any laws enacted for the purpose of regulating such labor are but a part of the general system by which the state protects society against the criminal classes, and relieves it, so far as may be, from the burden and expense of caring for them. The Albany Penitentiary, although a county institution, created and maintained as a county charge, and alone interested in and liable for any contract which it might enter into, has been at all times subject to the regulations of the state, in its treatment of the convicts which the state had authorized it to receive. It is one of the penal institutions of the state. Under a law of the state, it receives convicts from all parts of the state, and manifestly the management of the labor of such prisoners should be entirely under the control of the state. Nor is it claimed that the penitentiary has any power to contract out the labor of its prisoners as a natural right. It derives its sole authority, to furnish such labor, from the state. Were it to transact that business without such authority, every act therein would be unlawful, and every contract made in relation thereto would be invalid. It would have no more right to farm out the labor of its prisoners than it would have to carry on a lottery, or do any other act prohibited by law.

The only authority upon which plaintiff relies is that contained in section 103 of chapter 382 of the Laws of 1889; and it becomes important, therefore, to determine exactly what force and character are to be given to that section. In substance, it provides that the managing authorities of any penitentiary are hereby authorized to conduct the labor of the prisoners therein respectively, under the public account system or piece price system, in like manner, and subject to like restrictions, as labor is authorized by the provisions of that act to be conducted in the state prisons. One of the many restrictions contained in that statute makes it the duty of the superintendent of state prisons to determine what lines of productive labor shall be pursued in each prison, and requiring him to select diversified lines of industry, with reference to interfering as little as possible with the same lines of industry carried on by the citizens of this state. Another provides that the total number of prisoners employed at one time in manufacturing one kind of goods, which are manufactured elsewhere in the state, shall not exceed 5 per cent. of the number of all persons within the state employed in manufacturing the same kind of goods.

By section 102 of the act, it appears that the "public account sys-
tem" would not require contracts to be made with any third party,
but that the "piece price system" would require the intervention
of a third party in carrying it on.    It also, from that section, ap-
pears that just how far each institution may follow either of such
systems is subject to the control and determination of the super-
intendent of state prisons.    Evidently, this section contains no
contract between the state and the penitentiary that the system
adopted by that statute will continue for any definite period.    There
is no provision in it giving the penitentiary any right to make
a contract under it for any definite period, nor anything indicating
any such intent.    On the contrary, it is manifest from the restric-
tions, and section 102, above cited, that the superintendent of state
prisons had the authority, at any time, to make a rule which would
render inoperative any time contract that the penitentiary could
make.    It is said that it cannot "conduct the labor of its prisoners
on the piece price system" unless it made a contract for a definite
period.    I do not discover anything in the record to that effect;
and I do not know why we should assume that an arrangement
could not be made with a third party to furnish materials and ma-
chinery under the piece price system for such a term as the peni-
tentiary should have authority to so use them.    But, whether
such a contract could or could not be made, there is nothing in
the statute that authorizes any other.    It brings all the penal in-
stitutions in the state under one rule, so far as the employment of
convict labor is concerned; but no obligation is incurred on the
part of the state, to any of them, that the then existing system
shall be continued.    This section, then, under which the peniten-
tiary claimed to act, was neither a charter nor a contract in any
form with the state.    It was but a license from the state to carry
on a business which without permission it had no right to carry
on,—a license granted without consideration to the state, and
which it was evident must necessarily be revoked if the state should
at any time deem it wise to change its policy with reference to the
employment of convict labor; and such a revocation, as between
the penitentiary and the state, would violate no obligation on the
part of the state.    When, therefore, the penitentiary, on Decem-
ber 1, 1893, contracted with the plaintiff that it would on December
1, 1896, enter into a contract to furnish him for three years there-
after the labor of 125 convicts under the piece price system, if he so
desired, he knew that he was contracting with reference to a busi-
ness which the penitentiary had no right to carry on, save by the
authority derived through the statute above mentioned; and he
must therefore have known that such undertaking on the part of
the penitentiary could be carried out by it only in the event that
its permission to do so was continued by the state.    Such being the
case, the contract in question was based entirely upon the con-
tinuation of the license; and the revocation of that license, there-
fore, did not unlawfully impair its obligation.    No obligation was
created by such contract, unless the license continued.

But, if it be conceded that the section in question should be con-

strued as authorizing the penitentiary to contract under the piece price system for a definite period, the question remains whether such authority, or a contract made with reference to it, is a contract which is affected by the provision of the federal constitution, above referred to. It is well settled that there are certain lines of state legislation with which the limitations of the federal constitution were not intended to interfere. In the exercise of what is termed its "police power," the state may legislate in such a manner as to injuriously interfere with property rights, and impair the obligation of contracts, and the prohibitions of the federal constitution will not be operative against it. In Barbier v. Connolly, 113 U. S. 27, 5 Sup. Ct. 357, in discussing such constitutional limitations, it was said that they are not designed "to interfere with the power of the state (sometimes termed its 'police power') to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the business of the state, develop its resources, and add to its wealth and prosperity." It is claimed that the definition above cited extends such power much too far; and it may be that legislation upon all those subjects would not prevail against the limitations of the constitution. But all agree that legislation necessary to preserve the public health and public morals is clearly within that power.

In Board v. Barrie, 34 N. Y. 657, 666, it is said:

"It is a bold assertion, at this day, that there is anything in the state or United States constitutions conflicting with or setting bounds upon the legislative discretion or action in directing how, when, and where a trade shall be conducted in articles intimately connected with the public morals or public safety or public prosperity, or, indeed, to prohibit and suppress such traffic altogether, if deemed essential to effect those great ends of good government."

The rule here given extends the right to so legislate, not only to public health and morals, but also to public safety and public prosperity, and would seem to be an authoritative expression upon this subject, so far as the courts of this state are concerned. I do not find any subsequent decisions in our own state which vary that rule. On the contrary, they extend, rather than limit, it. People v. Budd, 117 N. Y. 1, 22 N. E. 670, 682.

The principle upon which this so-called "police power" is based may be found in the following language, used by Chief Justice Waite in Stone v. Mississippi, 101 U. S. 814:

"The power of governing is a trust committed by the people to the government, no part of which can be granted away. The people, in their sovereign capacity, have established their agencies for the preservation of the public health and the public morals, and the protection of public and private rights. These several agencies can govern according to their discretion, if within the scope of their general authority, while in power; but they cannot give away nor sell the discretion of those that are to come after them, in respect to matters the government of which, from the very nature of things, must 'vary with varying circumstances.' * * * The contracts which the constitution protects are those which relate to property rights, not governmental. It is not always easy to tell on which side of the line which separates governmental from property rights a particular case is to be put, but in respect to lotteries there can be no difficulty. * * * Certainly, the right to stop them is governmental, to be exercised at all times by those in power, at their discretion. Any one, therefore, who accepts a lottery

charter, does so with the implied understanding that the people, in their sovereign capacity, and through their properly constituted agencies, may resume it at any time when the public good shall require, and this whether it be paid for or not. All that one can get by such a charter is a suspension of certain governmental rights in his favor, subject to withdrawal at will. He has, in legal effect, nothing more than a license to continue on the terms named for a specified time, unless sooner abrogated by the sovereign power of the state."

Such is the principle upon which the Beer Co. Case, 97 U. S. 25, the Fertilizing Co. Case, Id. 659, and the Butchers' Union Co. Case, 111 U. S. 746, 4 Sup. Ct. 652, were decided. See New Orleans Gaslight Co. v. Louisiana Light & Heat Producing & Manuf'g Co., 115 U. S. 523, 6 Sup. Ct. 252.

The subject of prison management and the conduct of its convict labor by the state is a governmental right, and it is a subject the management of which must, of necessity, "vary with varying circumstances." I do not claim that the right to legislate so as to affect or control competition in any particular business is within the police power of a state, nor does the fact that that idea was a leading one in effecting the prohibition contained in our state constitution at all effect this question. The method of employing state convicts during the term of their imprisonment is a question of prison discipline, including many other considerations than the effect it may have upon the labor interests of the state. And, as a mere matter of such discipline, it is obviously a subject of governmental concern. The necessity and propriety of the government being, at all times, at liberty to legislate concerning it, untrammeled by prior legislation, is as strong as that it should have such freedom to legislate concerning a lottery, a slaughterhouse, or the manufacture and sale of liquor. The principle which exempts, from the operation of the limitations in the federal constitution, legislation in the latter cases, is equally applicable in the former. In each of these cases it is the exercise of a governmental function, which every citizen must recognize, and concerning a business that all know is at all times subject to state control. The state assumes this control over matters affecting the public health and public morals, because it is for the purpose of protecting and preserving them that governments are organized. And it has a similar control over the management of its prisons, and the use and discipline of its convicts, because a prison system is one of the means by which another of its governmental functions is carried on, viz. "the protection of public and private rights."

In the Dartmouth College Case, 4 Wheat. 518, 629, Chief Justice Marshall said:

"That the framers of the constitution did not intend to restrain the states in the regulation of their civil institutions, adopted for internal government, and that the instrument they have given us is not to be so construed, may be admitted."

The prison system of the state is one of the institutions to which that proposition is applicable; and, in my judgment, whatever authority was conferred by the state to the penitentiary by the statute of 1889, above cited, or whatever contract was thereby made between them, from the very nature of the subject with which it dealt,

it was accepted by the penitentiary with the implied understanding that the authority or right so given could be retaken by the state whenever, in the opinion of its proper agencies, the interests of its prison system required. Although such business did not affect public health or public morals, it comes within the principle which controls these cases. It is clearly a business which it is exclusively a governmental right, not only to control, but to conduct; and concerning it, therefore, one legislature could no more control the power of its successors than it could in relation to a business affecting the public health or public morals.

I conclude, therefore, that the power of the state to enact and repeal at its pleasure such special laws as are designed to regulate the management of its prison discipline and the use of its prison labor is not affected by the limitations of the federal constitution, and that the plaintiff's contract, being one concerning that subject, is no more controlled by those limitations than if it had been one concerning a lottery or the sale of liquor. He is not, therefore, in my judgment, entitled to a specific performance of the covenant to extend contained in the contract of December 1, 1893.

MERWIN, J., concurs.