CITY OF GREENFIELD, INDIANA *v.* HANCOCK COUNTY RURAL ELECTRIC MEMBERSHIP CORPORATION.

[No. 1-773A136. Filed June 26, 1974. Rehearing denied July 31, 1974. Transfer denied January 16, 1975.]

*C. Thomas Billings, Williams, Cone & Billings,* of Greenfield, *G. R. Redding, Virgil L. Beeler, Michael J. Huston, Baker & Daniels,* of Indianapolis, for appellant.

*William H. Wolf, Wolf & Robak,* of Greenfield, *Willett H. Parr, Jr.,* of Lebanon, for appellee.

GARRARD, J.—This case arises under § 18A of the Indiana REMC Act.[1] The City of Greenfield (City), which operates its own electric utility, on April 16, 1969; February 18, 1970; and May 14, 1971, annexed additional areas to the City. On March 23, 1972, the City filed a complaint under the Eminent Domain Act asserting its § 18A rights and seeking to condemn property of Hancock County Rural Electric Membership Corporation (REMC), which had theretofore been franchised to serve customers in all of the annexed areas. To this complaint the REMC filed 14 separate objections. Those

1.  IC 1971, 8-1-13-19 (Burns Code Ed.): "Whenever a municipality in which a public utility (including a corporation organized, or admitted to do business, under this act [8-1-13-1—8-1-13-27]) is rendering electric utility service under a franchise, license or indeterminate permit or in which a municipality-owned utility is rendering electric utility service, as the case may be (such public or municipal utility being hereinafter called the "franchised utility"), annexes additional territory and such annexed territory includes any territory in which the franchised utility was not authorized to render electric utility service immediately prior to such annexation but in which some other public utility (including a corporation organized, or admitted to do business, under this act) or municipally-owned utility (such public or municipally owned utility being hereinafter called the "other utility") was lawfully rendering electric utility service at such time, then the franchised utility and the other utility shall promptly negotiate for the purchase by the franchised utility of the property owned by the other utility within the annexed territory and used and useful by the other utility in or in connection with the rendering of electric utility service therein. In the event that such property has not been purchased by the franchised utility within 90 days after such annexation takes place, then the franchised utility may bring an action in the circuit or superior court of the county where such municipality (or the major part thereof in area) is located against the other utility, as defendant, for the condemnation of such property of the other utility. Until and unless such purchase or condemnation is effected, the other utility shall have authority to operate within the portion of the annexed territory in which it was lawfully rendering electric utility service immediately prior to such annexation. [Acts 1935, ch. 175, § 18A, as added by Acts 1953, ch. 48, § 2, p. 153.]

involved in the appealed-from findings and decision by the court may be generally categorized as follows: (1) The complaint was insufficient in its allegations and the description of the property sought to be condemned; (2) the action was additionally defective because there had been neither a bona fide prior effort to purchase nor a proper authorization by the City to institute suit; (3) as to the 96.83 acre tract involved, the City was barred from bringing the action due to an injunction previously entered with regard to that tract; and (4) the City was barred from bringing the action because it had contracted away its right to serve in the annexed area. Hearing was had upon REMC's objections and thereafter the trial court entered its findings of fact, conclusions of law and its judgment sustaining the objections. The City filed a timely motion to correct errors, which was overruled, and this appeal follows. The motion to correct errors attacks various findings of fact and conclusions of law entered by the court, attacks the sufficiency of the evidence generally, and asserts that the decision is contrary to law. For the sake of clarity, our opinion treats the matters raised thereby on the basis of the subject matter involved in the variously asserted errors.

## I—SUFFICIENCY OF COMPLAINT

The first issue presented is whether the City's complaint for condemnation was sufficient.

The complaint, omitting formal parts and legal description of the annexed areas, is as follows:

### "COMPLAINT

The plaintiff, City of Greenfield ("City"), for its complaint against the defendant, Hancock County Rural Electric Membership Corporation ("REMC"), states that:

1. The City is a municipality located in Hancock County, Indiana. The City owns and operates an electric utility and renders electric utility service to the City and its inhabitants under the laws of the State of Indiana and has done so for many years.

2. The REMC is a corporation organized and existing under the Rural Electric Membership Corporation Act, as amended and supplemented, Burns §§ 55-4401, *et seq.*

3. On April 16, 1969, the City annexed the following described parcel: [107.24 acres, plus 96.83 acres].

On February 18, 1970, the City annexed the following described parcel: [157.485 acres].

On May 14, 1971, the City annexed the following described parcel: [3.39 acres].

4. Each parcel of the Annexed Territory includes territory in which the City was not authorized to render electric utility service immediately prior to its annexation but in which the REMC was lawfully rendering electric utility service at such time. The REMC owned or operated property within each parcel of the Annexed Territory immediately prior to its annexation which was used and useful by the REMC in or in connection with its rendering of electric utility service therein.

5. The City now proposes to render electric utility service to the public throughout the Annexed Territory. For such use and purpose it is necessary for the City to acquire the property owned by the REMC within the Annexed Territory and used and useful by the REMC in or in connection with the rendering of electric utility service therein. Such property includes without limitation the interests of the REMC in all equipment, pins, poles, guy anchors, guy wires, conductors, insulators, clamps, bolts, rod armors, cables and transformers within the Annexed Territory and used and useful by the REMC in or in connection with the rendering of electric utility service therein. Such property is a part of the rural electric utility system owned by the REMC.

6. Promptly after the annexation of each parcel of the Annexed Territory, the City negotiated with the REMC for the purchase by the City of such property owned by the REMC. In such negotiations the City made an effort to purchase such property for such use and purpose but has been unable to agree with the REMC for the purchase of such property, and the City has not purchased or acquired such property from the REMC.

7. The City has the right to exercise the power of eminent domain for the purpose of acquiring such property from the REMC under the laws of the State of Indiana, including Section 18A of the Rural Electric Membership Corporation Act (Burns § 55-4418a Supp.), and the City now seeks to exercise such power to acquire such property.

WHEREFORE, the City requests that the property owned by the REMC within the Annexed Territory and used and useful by the REMC in or in connection with the

rendering of electric utility service therein be condemned to the City's use for the purpose of rendering electric utility service within the Annexed Territory; that the Court appoint three disinterested freeholders of Hancock County to assess the damages, if any, which the REMC may sustain or be entitled to by reason of such condemnation; that upon payment to the clerk of the damages so assessed, the right to possession of such property be vested in the City; and for all other relief proper in the premises."

Upon hearing the court found that the City failed to set out with any clarity or definiteness what it proposed to condemn; that it failed to allege or prove the requirements of § 55-4418a; and that neither party made a bona fide or good faith effort to negotiate for the purchase of the property by the City. Upon these findings the court entered appropriate conclusions of law, including the general conclusion that the law was with REMC.

We first consider the adequacy of the description. In Indiana, it is well established that the description used in eminent domain proceedings must be sufficient to furnish the means by which the property sought to be appropriated may be identified with certainty, but it is not necessary that the description itself fully identify it. *Hagemann* v. *City of Mount Vernon* (1958), 238 Ind. 613, 154 N.E.2d 33; *Darrow* v. *Chicago, etc., R. Co.* (1907), 169 Ind. 99, 81 N.E. 1081.

The REMC asserts that this standard was not met because paragraph 4 of the complaint merely alleges that "each parcel of annexed territory *includes* territory" in which the City was not authorized to serve, but in which REMC was authorized to serve. This allegation could certainly have been made with greater clarity. Its form apparently resulted in part from the fact that as a result of a 1946 sale to REMC (hereinafter discussed) the City did serve certain property in the annexed area prior to the annexation proceedings.

However, in construing the sufficiency of a complaint in eminent domain, the averments of the entire complaint

rather than those of a single grammatical paragraph control. *Guerrettaz* v. *Public Service Co. of Indiana* (1949), 227 Ind. 556, 87 N.E.2d 721.

Here the paragraph in question is preceded by the legal description of the annexed areas and is followed by the allegation that the City proposes to serve the *entire* annexed area and it is necessary for the City to acquire the property owned by REMC therein which is used and useful in or in connection with rendering such service.[2] Thus, the allegation basically follows the language of § 18A, which itself specifies what the City must condemn.

Even if such an appropriation were to cause damage to the residue of REMC's property,[3] no description of the residuary property is essential to the complaint. Rather this may be covered by instructions to the appraisers and objection to their award. *Sadlier* v. *State* (1969), 252 Ind. 525, 251 N.E. 2d 27.

In the just-decided case of *Indiana & Michigan Electric Co.* v. *Whitley Co. REMC* (1974), 160 Ind. App. 447, 312 N.E.2d 503, we determined that under § 18A there may be a "taking" of property of the other utility (REMC) which is physically located outside the annexed area, and that this is a factual issue.

While we again stress the propriety of attempting to resolve such issues in the pre-condemnation effort to purchase required by the statute, where disagreement persists, the existence and extent of damage to such property, like damage to the residue, are properly matters for instruction by the court, determination by the appraisers, and, if necessary, exception thereto.

2. A substantially similar description of the property sought was approved in proceedings pursuant to Ind. Ann. Stat. § 54-606, IC 1971, 8-1-2-93 (Burns 1951 Replacement) in Indiana Service Corp. v. Town of Flora (1944), 223 Ind. 114, 58 N.E.2d 343.

3. We do not imply the existence of any such damage. Here we are simply concerned with its irrelevance to the allegations of the complaint.

When considered within the language of § 18A, the description set forth in the complaint was sufficient.

Similarly, a plain reading of the complaint *en toto* clearly advises REMC and the court that the action arises under § 18A, and the necessary allegational elements to invoke the statute are present.

## II—EFFORT TO PURCHASE

However, the court also found that in fact neither party made a good faith effort to negotiate a purchase and sale. Such an effort is a condition precedent to the right to condemn. *Wampler* v. *Trustees of Ind. Univ.* (1961), 241 Ind. 449, 172 N.E.2d 67; *Dahl* v. *Northern Ind. Pub. Serv. Co.* (1959), 239 Ind. 405, 157 N.E. 2d 194.

Here the record indicates that prior to making its offer to purchase, the City had its utility superintendent make an appraisal of the REMC assets in the annexed areas. His appraisal was made on the basis of replacement cost which he then depreciated, arriving at a value of $1,966.45. He also estimated REMC would incur approximately $89.52 in expenses to deadend their lines outside the annexed areas. The City then offered $4,039.20 as the total compensation for REMC's property within the annexed areas and "the compensable damages, if any," which REMC might sustain.

In *Wampler, supra,* our Supreme Court expressly rejected as the determination of good faith the "market value of the land" theory and held instead:

> "What constitutes a 'good faith' or 'bona fide' offer to purchase? Each case must be determined in light of its own particular circumstances. However, the authorities generally indicate that where there is disagreement regarding the value of property, if a reasonable offer is made honestly and in good faith and a reasonable effort has been made to induce the owner to accept it, the requirements of the statute for an offer to purchase have been met.
>
> In our judgment the statute here (§ 3-1701, *supra*) does not contemplate an impossibility to purchase at any price,

however large, but merely an unwillingness on the part of the owner to sell [except] at a price which in the petitioner's judgment is excessive. In such an event the attempt to agree need not be pursued further than to develop the fact that an agreement to purchase is not possible at any price which the condemnor is willing to pay." (citations omitted) 241 Ind. 456, 457, 172 N.E.2d 67, 71.

In the case presented here two significant circumstances emerge from the record.

First, the REMC's evidence did not attack the values placed by the City on the tangible items owned by REMC that were located within the annexed area. The REMC manager even conceded that in his opinion the only repairs or direct rehabilitation that would be necessary to the remaining REMC system would be the deadending of the existing lines into the annexed areas. Instead, REMC's attack on the bona fides of the offer is based upon its theory that the measure of its compensable injury should be more than the value of the tangible assets taken, while the City's valuation is limited to these tangibles.[4] We have no doubt as to the good faith of both sides in assuming these opposing legal positions.

Secondly, however, when the offer to purchase was made by the City under letter dated March 10, 1972, the REMC Board of Directors expressly decided not to respond and, in fact, made no counter-proposal or communication whatever to the City regarding the offer or why REMC felt it to be inadequate. (Additionally, REMC stipulated to the truth of the assertions made in the letter of March 10 that REMC had also refused to answer four prior letters sent by the City during the period since the first of the three annexations, wherein the City sought to negotiate for the purchase of

---

4. Thus, one of REMC's objections to the complaint asserted the City's failure to "include as property" such things as the right to serve the area, the value of an indeterminate permit and damage to going concern value. At the hearing REMC's examination of its manager, as well as its cross examination of the City's manager, focused on such items as loss of engineering investments, loss of customer revenue, both present and potential, and going concern value.

the REMC property involved.)[5] The City's offer thus appears to have been honestly made upon its bona fide position regarding the legal measure of damages.[6] Accordingly, upon the repeated total refusal of REMC to respond to its communications in any fashion, it is difficult to discern what else the City might have done, except proceed to suit.

Section 18A enjoins both utilities to negotiate, and under the circumstances here present we consider that the City was justified in concluding that an agreement to purchase was not possible at any price the City was willing to pay. Accordingly, the condition precedent to suit was satisfied.

## III—AUTHORIZATION TO CONDEMN

Finally, the court found that the complaint was filed without proper authorization by the City.

The record discloses that on March 1, 1972, the Greenfield Board of Public Works and Safety adopted the following resolution:

"WHEREAS, the policy followed by previous administrations of the City of Greenfield to furnish and operate its electric utility service within the corporate boundaries is advantageous and desirable for the citizens of Greenfield;

"NOW, THEREFORE, IT IS:

"RESOLVED, that the policy consistently followed in the past of the City of Greenfield to operate its municipal electric utility and to render electric utility service through-

---

5. One letter related to the area annexed in 1969, one to the 1970 area, and two were addressed to the 1971 annexation.

6. While the total absence of any response by REMC in the case before us makes it unnecessary to decide the question, we recognize that inherent in the REMC position is the concept that § 18A involves more than the tangible property of the "other utility" located within the annexed area. Thus, another of the conceivable threshhold issues is whether there can be a good faith offer to purchase where the parties do not agree upon what is involved. See, Indiana Service Corp. v. Town of Flora (1941), 218 Ind. 208, 31 N.E.2d 1015. We do not read the Flora case or Dzur v. NIPSCO (1972), 257 Ind. 674, 278 N.E.2d 563 as requiring such a conclusion where the dispute is over the legal measure of damages. Cf. Blaize v. Public Svc. Co. of Ind., Inc. (1973), 158 Ind. App. 204, 301 N.E.2d 863 (trf. den.). That this is in reality the issue, see Ind. & Mich. Electric Co. v. Whitley Co. REMC, supra.

out its entire municipal limits, as enlarged from time to time by annexation, is readopted, ratified and confirmed;

"FURTHER RESOLVED, that the Mayor, City Attorney and Superintendent of the municipal electric utility are authorized and directed to acquire by purchase or condemnation the property of any other utility within areas heretofore or hereafter annexed used and useful by such other utility in or in connection with the rendering of electric utility service in such areas immediately prior to annexation;

"FURTHER RESOLVED, that the Mayor, City Attorney and Superintendent of the municipal electric utility are authorized and directed to do all acts necessary or desirable to acquire such used and useful property and all acts heretofore taken to acquire such used and useful property are hereby ratified and approved."

While there was testimony that the policy referred to had indeed been the policy of the City for a number of years, it is not disputed that the City Council, itself, adopted no ordinance authorizing the condemnation nor did it ever expressly ratify the resolution of the Board of Works.

The Eminent Domain Act, IC 1971, 32-11-1-1 *et seq.* (Burns Code Ed.) expresses no requirement regarding authorization procedures necessary to commence condemnation proceedings by either governmental units or other corporations. However, municipalities, having only that authority which is granted by the state, must follow the municipal procedures prescribed by the legislature. In that regard the provisions of the Cities and Towns Act of 1905 relating to condemnations by municipalities[7] are considered to be a special law that acts as an exception to the general law provided in the Eminent Domain Act, since both were adopted by the same legislature. *Hagemann* v. *City of Mount Vernon, supra.*

7. The sections expressly considered now appear in IC 1971, 18-1-7-1—18-1-7-11, Ind. Ann. Stat. §§ 48-2001—2010 (Burns 1963 Replacement). § 48-2001 is unchanged since 1905. Although *Hagemann* did not expressly consider IC 1971, 18-1-6-15, § 48-1902, prior to the 1969 and 1971 amendments discussed *infra*, it was unchanged and a part of the same act of 1905, and is necessarily included within the *Hagemann* holding.

The Cities and Towns Act vests the City's power to condemn in the board of public works. Until 1969 the statute, Ind. Ann. Stat. § 48-1902 (Burns 1963 Replacement) provided:

"The board of public works shall have power:
First. To condemn, rent or purchase any real estate or personal property needed by any such city for any public use, except when a different provision for purchase is made by this act: Provided, That when a sum of more than two thousand dollars [$2,000] is required to be paid for condemnation, rent or purchase of any real estate or personal property, the same shall not take place unless the condemnation, rent or purchase is specifically authorized by ordinance.
. . . ."

In 1969 the proviso that the condemnation not take place without an ordinance if more than $2,000 was required to be paid was deleted.[8] In 1971 the provision was amended to read:

"The board of public works shall have the power:
First. To condemn, rent or purchase any real estate or personal property needed by any such city for any public use, except when a different provision for purchase is made by this chapter: Provided, That the common councils of all cities shall have the power to:
(a) Require that all such condemnations, rentals or purchases be included in the long-range capital expenditure program to be proposed by boards of public works, and to require that such program be updated at least annually, or otherwise at the discretion of the common council;
(b) Require boards of public works to set forth at least annually estimates of needed expenditures for the above purposes for each successive fiscal year;
(c) Approve, amend or disapprove both the contents of the long-range capital expenditure programs and the amounts of proposed annual expenditures, in whole or in part, prior to and/or during the time of adoption of municipal budgets, at the council's discretion;
(d) Require the estimates of capital program expenditures for each fiscal year to be itemized in such manner

---

8. This express language calling for an ordinance was even held to be a condition subsequent rather than a condition precedent to condemnation. City of East Chicago v. Interstate Iron & Steel Co. (1914), 183 Ind. 33, 107 N.E. 274.

for approval, amendment or rejection as the councils may determine.

The foregoing powers conferred on common councils shall be implemented only by adoption of an appropriate ordinance or ordinances."

It is nowhere suggested by the parties, or the record, that the Greenfield common council ever enacted the required ordinance to impose any of the proviso limitations or requirements upon the general authority granted by the legislature to the board of public works.

The board of public works had the power to authorize the condemnation.

Furthermore, while IC 1971, 18-1-7-1, Ind. Ann. Stat. § 48-2001 (Burns 1963 Replacement) provides:

"Whenever the board of public works of any city shall desire to appropriate or condemn, for the use of such city, any property, real or personal, or to open, change, lay out or vacate any street, alley or public place within such city, including proposed street or alley crossings of railways or other rights of way, in cases where the proposed street or alley is to cross the same, it shall adopt a resolution to that effect, describing the property which may be injuriously or beneficially affected, and shall cause notice of such resolution to be published in a newspaper of general circulation published in such city, once each week for two [2] consecutive weeks. Such notice shall name a date, not less than ten [10] days after the last publication, at which such board will receive or hear remonstrances from persons interested in or affected by such proceeding. Such board shall consider such remonstrances, if any, and thereupon take final action, confirming, modifying or rescinding its original resolution, which action shall be final and conclusive on all persons."

This form of resolution relates to the procedure for condemnation by a city (outside the Eminent Domain Act) prescribed in the sections of the statute immediately following. (IC 1971, 18-1-7-1—18-1-7-11, Ind. Ann. Stat. §§ 48-2001—2010 [Burns 1963 Replacement]) *Halstead* v. *City of Brazil* (1925), 83 Ind. App. 53, 147 N.E. 629; *Hagemann* v. *City of Mount Vernon, supra.*

These provisions were amended in 1961 by adding a new section permitting a city, at its option, to proceed instead under the Eminent Domain Act:

"Whenever any city or town shall have the power to appropriate or condemn any real or personal property under this act, or whenever any other act provides that proceedings by any city or town for appropriation or condemnation of any real or personal property shall be under and pursuant to this act, the city board exercising such powers or the board of town trustees may in its discretion, in lieu of proceeding under Section 97 [§ 48-2001] or any other sections of this act, proceed, and effect such appropriation or condemnation, under the provisions of Acts 1905, c. 48 [§§ 3-1701—3-1712] as amended." IC 1971, 18-1-7-2, Ind. Ann. Stat. § 48-2001a (Burns 1963 Replacement).

Accordingly, the board of works being vested with the power to condemn on behalf of the city and having elected to proceed under the Eminent Domain Act, the resolution adopted by it on March 1, 1972 was sufficient to authorize the action.

## IV—THE DEED AND BILL OF SALE

We next consider whether a deed and bill of sale given by the City to REMC prevents the City from now serving the annexed areas.

Prior to 1946 the City had provided electric service outside its then corporate limits.[9] In November 1945 the city mayor, by letter, indicated the city's desire to consolidate its service within city limits and offered to REMC the entire rural area then being served. Negotiations were entered into, an agreement was reached and the sale was submitted to and approved by the Public Service Commission.[10] In accordance with that approval the City executed and delivered its deed and bill of sale which, in relevant part states that the City has:

". . . granted, bargained, sold, conveyed, warranted, transferred and assigned and does by these presents grant,

---

9. At that time the City was providing some actual service in the annexed areas and was apparently serving 212 total rural users.
10. The area involved covered approximately 36 square miles and included the annexed areas.

bargain, sell, convey, warrant, transfer and assign to the grantee, its successors and assigns . . ."

". . . all licenses, franchises, ordinances, authorization, privileges and permits owned or held by the Grantor, or heretofore granted, issued or executed to the Grantor or its assignees [sic] by the United States of America, or by the State of Indiana."

"TO HAVE AND TO HOLD the System and every part thereof, whether real, personal or mixed, and whether tangible or intangible, to the Grantee, its successors and assigns forever."

The court found that this conveyance now prohibits the City from exercising its right to eminent domain as to the areas therein described.

We first observe that the mere sale and conveyance of a fee simple interest by a grantor possessing the power of eminent domain, without express reservation in the conveyance contemplating the potential future exercise of the power, does not *per se* deprive or bar the grantor of its eminent domain rights.

As stated in *Southern Indiana Gas & Electric Co.* v. *City of Boonville* (1939), 215 Ind. 552, 20 N.E.2d 648:

"The basis of the authority of the state to provide for the forced taking of utility property by the municipality, whether under the act of 1933, the act of 1913, or the act of 1905 was the same, namely, the doctrine of eminent domain. The law recognizes no other justification for the forcible taking of private property for public use. The power of eminent domain is an attribute of sovereignty and inures to every independent state. It cannot be surrendered, and, if attempted to be contracted away, it may be resumed at will. It is superior to all property rights, and extends to all property within the jurisdiction of the state. Every contract, whether made between the state and an individual, or between individuals only, must yield to it whenever necessity for its exercise shall occur. Every contract is made in subordination to it. The existence of this power must be presumed to be known and recognized by all, and need never be carried into express stipulations, for this would add nothing to its force. *West River Bridge Co.* v. *Dix* (1848), 6 How. (47 U.S.) 507, 12 L.Ed. 535; *Georgia* v. *City of Chattanooga et al.* (1924), 264 U.S. 472, 44 S.Ct.

369, 68 L.Ed. 796." 215 Ind. 552, 560; 20 N.E.2d 648, 651-2.

See, also, *Osborn* v. *Nicholson* (1871), 80 U.S. (13 Wall.) 654, 660, 20 L.Ed. 689; *Ft. Wayne & S. W. Traction Co.* v. *Ft. Wayne & W. Ry.* (1908), 170 Ind. 49, 83 N.E. 665; *City of Terre Haute* v. *Evansville & Terre Haute R.R. Co.* (1897, 149 Ind. 174, 46 N.E. 77; *Murphy* v. *Beard* (1894), 138 Ind. 560, 38 N.E. 33.

It is urged, however, that the instrument here involved creates a contractual bar to the exercise of the power within the doctrine of the second Boonville case, *Southern Ind. Gas & Elec. Co.* v. *Boonville* (1969), 252 Ind. 385, 248 N.E.2d 343.

In that decision our Supreme Court found that the City of Boonville, which operated its own utility, was not entitled to condemn the defendant's utility property located within two newly annexed subdivisions in contravention of a contract existing between the city and the utility which provided:

"That it [City of Boonville] will sell electricity only to its customers residing within the city limits of Boonville, Indiana, as said city limits existed on June 6, 1941, and to those customers who are located on what is known as the 'Lake Drain Line' and to Mary Johnson, J. L. Petrey, J. D. Burton and the Fair Grounds Association; and that it will not extend its service to any other customers or territory without the written consent of the Company and without first obtaining legal authority to do so." 252 Ind. 385, 388; 248 N.E.2d 343, 344-5.

Thus, the provision there before the court was explicit and was contained as a part of a contract for the purchase of energy from Southern Indiana Gas & Electric Company. That contract had originated in 1947, been reaffirmed in 1959, was again supplemented and reaffirmed in 1965 and was extended to 1974.

The deed and bill of sale before us does not bring REMC within the *Boonville* doctrine.

First of all, there is no express covenant or agreement against future expansion, reacquisition or competition contained in the deed.

Instead, the court was required to rely upon the recitals that the conveyance was to include:

> ". . . all licenses, franchises, ordinances, authorization, privileges and permits owned or held or heretofore granted. . . ."

> "TO HAVE AND TO HOLD . . . to the grantee, its successors and assigns forever."

The primary rule in the construction of conveyances is that the instrument is to be taken as a whole and the grantor's intention should control *Goodpaster* v. *Leathers* (1889), 123 Ind. 121, 23 N.E. 1090; *Fall Creek School Tp.* v. *Shuman* (1913), 55 Ind. App. 232, 103 N.E. 677; *Adams* v. *Merrill* (1909), 45 Ind. App. 315, 85 N.E. 114, 87 N.E. 36.

In so doing, we observe that virtually since the abolition of fee tail estates, such phrases as "to have and to hold to the grantee, its successors and assigns forever" have had a uniform and common usage. The phrase designates the quality of the estate passed, i.e. fee simple title.

As stated by the Iowa court in *In re Lewis' Estate* (1957), 248 Iowa 227, 80 N.W.2d 347:

> ". . . the phrase . . . is too clearly associated with the transfer of fee simple title to permit any suggestion of doubt as to its meaning in instruments of conveyance." 248 Iowa 227, 230, 80 N.W.2d 342, 349.

That the conveyance included whatever incorporeal rights the City then held and was capable of conveying to serve in the area outside the City is not doubted. Indeed, authorization for this was the primary purpose of the proceeding before the public service commission, and upon the basis of its conveyance the City might be potentially liable either because of defects in its title causing disputes between REMC and third parties, or if the City itself contravened the covenants of its conveyance.[11]

---

11. While not emphasized therein, this factor provides an additional basis for the injunction rulings in the prior cases between these parties. See, Hancock REMC v. City of Greenfield (1970), 253 Ind. 402, 254 N.E.2d 865 (complaint for injunction good against demurrer); City of Greenfield v. Hancock REMC (1971), 256 Ind. 15, 266 N.E.2d 799 (temporary injunction sustained) where the City did not attempt eminent domain proceedings.

REMC contends, however, that unless any such conveyance contains the implied waiver of the right to condemn in the future, no purchaser is safe and the conveyance is not meaningful. This is the precise argument that has been advanced and rejected in the general cases dealing with sales and conveyances by grantors possessing the power of eminent domain, discussed *infra*. The correct analysis is that having conveyed, the City cannot dispute its covenants of conveyance, but it may reacquire the property either by voluntary sale or in a taking *by law* upon the payment of *just compensation*. As succinctly stated by the Georgia Supreme Court:

> "There is no inconsistency between a grant in its terms perpetual, and a subsequent resumption of the property granted; this resumption being made for public use, and in the exercise of the right of eminent domain. The state itself could not grant an easement which would not be subject to resumption in the exercise of this right, and certainly the city could not. It is no revocation or violation of the grant under which private property is held, to take it for public use, on making adequate compensation to the owner. On the contrary, the proceeding to condemn and take, if it has self-consistency, concedes the sacredness of the grant, and the creation thereby of all the attributes of ownership which can arise by inviolable contract." *Trustees of Atlantic Univ.* v. *City of Atlanta* (1893), 93 Ga. 468, 21 S.E. 74.

Accordingly, even in the exercise of one of its proprietary functions, government will not be said to have contractually waived its right unless the contractual language clearly evinces that intent. No such language appears in the deed and bill of sale.

There is, in addition, another distinction between the present circumstances and that in *Boonville* which buttresses our analysis of the document here in question.

The *Boonville* court said of the city:

> "It has not lost the right to exercise the power of eminent domain, but has made a contract which prevents it from succeeding in such a case if it should bring an action of eminent domain." 252 Ind. 385, 390, 248 N.E.2d 343, 345.

Thus, the essence of *Boonville* is the contractual restraint against competition, albeit within the framework of the public utility laws, contained in a current agreement for services with a stated expiration date.

When that is contrasted with a single sale made more than 25 years prior to the commencement of this proceeding, accompanied by the contention that the City should be bound in perpetuity from extending its service, the public policy confining such restraints to standards of reasonableness is brought to bear.[12]

While public policy regarding utility service favors a general restraint on competition for the benefit of consumers through the public service commission laws, in Section 18A the legislature determined that public interest is best served if the electric utility authorized to serve a city or town be permitted (upon payment of proper compensation) to serve additional areas incorporated into and becoming a part of the city or town. We are not here called upon to define the perimeters for a contractual limitation of that expressed policy, except to observe that the asserted agreement in perpetuity before us would be contrary to the public welfare as therein expressed.

## V—PRIOR INJUNCTIONS

Finally, the court concluded that as to the 107.24 acre and the 96.83 acre tracts annexed, the City was barred from maintaining its action by virtue of injunctions entered in other litigation.

The following is the background relevant to these conclusions. Following the 1969 annexations (in which areas REMC was not actually providing service to customers and in which it had no tangible property located) the City took steps to simply commence providing service. REMC brought suits

12. cf. Donahue v. Permacel Tape Corp. (1955), 234 Ind. 398, 127 N.E.2d 235; Wiley v. Baumgardner (1884), 97 Ind. 66; Struever v. Monitor Coach Co., Inc. (1973), 156 Ind. App. 6, 294 N.E.2d 654 (trf. denied).

to enjoin this activity and in May 1970 in one action the Hamilton Circuit Court entered a temporary injunction prohibiting the City from either constructing additional facilities or providing electric service to customers in the 96.83 acre tract until further order of the court.[13] This decision was the subject of the appeal in *City of Greenfield* v. *Hancock County REMC* (1971), 256 Ind. 15, 266 N.E.2d 799. On appeal the Supreme Court affirmed the grant of temporary relief and concluded:

> "This was sufficient evidence upon which to issue the temporary injunction. As to what is or what is not compensable and the amount of compensation to be paid to the appellee [REMC] by the appellant city *are matters* upon which evidence must be heard and a decision made *in a condemnation action,* if the parties are unable to arrive at a voluntary purchase agreement." (Our emphasis) 256 Ind. 15, 19; 266 N.E.2d 799, 802.

Thereafter, the Henry Circuit Court which had originally denied relief in the case involving the 107.24 acres, granted REMC's TR. 60 motion, entered new findings, including that the City was extending service into that tract without purchasing or condemning the REMC property within the annexed area and used and useful in or in connection with rendering service therein, and entered a permanent injunction prohibiting the City from further construction of electric facilities within the area and from serving customers therein.

It has been generally recognized that an injunction does not create rights. Rather it protects the complainant's rights already *in esse* from an unlawful injurious interference. *McKain* v. *Rigsby* (1968), 250 Ind. 438, 237 N.E.2d 99; *State ex rel. Indiana Alcoholic Beverages Comm.* v. *Cir. Ct. Marion Co.* (1943), 221 Ind. 572, 49 N.E.2d 538; *Park* v. *Morgan* (1913), 52 Ind. App. 478, 100 N.E. 861; 42 Am. Jur. 2d, *Injunctions,* § 323.

The rights of REMC here protected were those afforded by its indeterminate permit to serve the areas in the absence

---

13. There was an exception to the prohibition relating to certain property served by the City prior to and after the 1946 sale, the particulars of which are not germane to the matters before us.

of a purchase or condemnation pursuant to § 18A. This is clearly the thrust of the Supreme Court's concluding statement set forth above.

Here neither injunction, by its language, prohibits a condemnation action.[14] If the City proceeds to in fact condemn and acquire the REMC property, the inherent equity power of the court permits appropriate modification or vacation of the injunctive orders. See, e.g. *United States* v. *Swift & Co.* (1932), 286 U.S. 106. On the other hand, if the City fails or falters in consummating the acquisition, then any other modification of the injunctions might be uncalled for. Accordingly, since an injunction need not be modified to spell out something which it does not purport to prohibit,[15] it was unnecessary for the City to seek a modification of these orders before commencing its action.

The judgment of the trial court is accordingly reversed and remanded for further proceedings consistent herewith.

Hoffman, C.J. and Staton, J., concur.

NOTE.—Reported at 312 N.E.2d 867.

14. Although the impetus originated in the trial court, the Supreme Court in the second Boonville case, *supra*, did not disapprove the interpretation there made that a similar original injunction against providing service did not prohibit an action to condemn. The case was then appealed on the order denying objections to the condemnation complaint.

15. Pence v. Garrison (1883), 93 Ind. 345.